UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA MARIE FOX,

                Plaintiff,                      Case No. 1:15-cv-10968
                                            District Judge Thomas L. Ludington

v.                                          Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 17) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 13)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment, **DENY** Plaintiff's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

**II.**    **REPORT**

        Plaintiff, Lisa Marie Fox, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for supplemental security income.  This

matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 13), the

Commissioner's memorandum in opposition and cross motion for summary judgment (DE 17), Plaintiff's reply (DE 18), and the administrative record (DE 10).

## A.    Background

Plaintiff protectively filed her application for benefits on February 22, 2012, alleging that she has been disabled since August 20, 2011.  (R. at 152-157 and 170-177.)  Plaintiff generally alleged disability on the basis of her "conditions," without further elaboration.  (Id.)  Plaintiff's application was denied.  Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Kevin Fallis held a hearing on June 13, 2013 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 10-89.)  On January 13, 2015, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Fallis's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

## B.    Plaintiff's Medical History

### 1.    Physical Health Treatment

Plaintiff has a long history of physical and mental impairments, which are summarized briefly below and, in relevant part, throughout the analysis.  Plaintiff suffered a stroke in 2007, after developing sudden left-sided weakness.  (R. at 239-240.)  Soon after, on January 9, 2008, she was seen by occupational therapists at

Hurley Medical Center, who noted that she had mild deficits in her upper and lower extremities.  (R. at 259-260.)  She began seeing neurologist M.N. Sabbagh, M.D., in 2008 for follow-up.  On March 26, 2008, Dr. Sabbagh noted that Plaintiff was "doing great," with no memory problems, weakness, numbness, or difficulty thinking.  He advised her to be active mentally and physically on a regular basis. (R. at 430.)  On April 29, 2009, however, Plaintiff complained of fatigue and lack of energy, but an exam showed her to be awake, alert, and oriented, but a bit depressed. (R. at 429.)  A month later, Plaintiff again reported feeling tired, but noted that Wellbutrin was helping.  (R. at 428.)  Dr. Sabbagh concluded that she would likely have a good prognosis.  (Id.)  On May 28, 2008, he reported that Plaintiff continued to improve.  (R. at 427.)

On August 18, 2011, Plaintiff presented to the Hamilton Community Health Network with complaints of low back pain, but denied numbness and weakness and noted that she could walk without pain.  (R. at 371.)

Plaintiff saw Dr. Sabbagh in February of 2012, complaining of pain and numbness in both hips.  (R. at 425.)  Dr. Sabbagh advised her to lose wegith, quit smoking, and increase her pain medication.  She had similar complaints in April of 2012, and Dr. Sabbagh referred her to receive lumbar epidural steroid injections. On June 1, 2012, Plaintiff reported that the steroid injections did not help.  (R. at 424.)  She also complained about feeling dizzy after taking Neurontin and Vicodin.

Dr. Sabbagh noted that Plaintiff had full strength in her four extremities with a right ankle jerk. (Id.) Plaintiff again reported pain on July 11, 2012, but an exam showed her to be in "no acute distress," with full strength in her extremities. (R. at 423.)

In addition to her physical problems, Plaintiff also suffers from mental impairments. She presented to the Hamilton Community Health Center on January 21, 2011, with complaints of depression, headache, and insomnia. (R. at 346-47.) She was prescribed medication, including Aspirin, Prozac, Fioricet, Ibuprofen, and Naproxen. (R. at 349-50.) She was again seen on September 9, 2011, with complaints of back pain, fatigue, headache, impaired concentration, and thoughts of suicide. (R. at 373-74.) Kay Southern, Nurse Practitioner, adjusted Plaintiff's medications and instructed her to quit smoking. (R. at 375.)

Plaintiff began seeing Veronica Williams, Ph.D., ACSW, BCD, LMSW, on November 9, 2011. (R. at 335.) Dr. Williams diagnosed her with Bipolar 1 disorder and placed her on Seroquel, but noted that her prognosis was fair if she remained in therapy. (Id.) On December 7, 2011, Plaintiff noted to Dr. Williams that her depression became worse after her stroke. (R. at 408.)

4

C.    **Hearing Testimony**

1.    **Plaintiff's Testimony**

a.    **Work History**

At the June 13, 2013 administrative hearing, Plaintiff testified that she lived with her 13 and 14 year old daughters in a trailer home. (R. at 34.) She noted that she could drive and had a car that was "drivable," but pointed out some mechanical issues that caused it to only go up to 25 miles per hour. (R. at 34-35.) Plaintiff testified that she graduated from high school, albeit a year late, and had some college. (R. at 36.) In addition, she had an expired certification as a CNA. (R. at 37.)

Plaintiff described her most recent employment as a home health care provider at Home and Hospice Advantages ("Hospice"). (R. at 37-38.) She was employed at Hospice from May to August of 2011. (R. at 39.) The position involved going into patients' homes to help with baths, range of motion, feeding, and other needs, including moving them from place to place. (R. at 38.) Plaintiff noted that she did well at the position because it was very structured and included a detailed checklist for each patient. (R. at 39.) She testified that she was able to undertake the physical aspects of the job with "a little back support," and did not start getting weak until the end of her three-month tenure. (Id.) According to

Plaintiff, her employer let her go two weeks after her back problems started, but its reason for doing so involved inadequate licensure. (R. at 40.)

Prior to her position at Hospice, Plaintiff worked at the Birchwood Meadows Nursing home, where she performed similar tasks: bathing, feeding, and transferring patients. (R. at 41.) Before that, she worked as a cashier at the Save-a-Lot grocery store, which involved cleaning and stocking. (R. at 42.) The most she lifted during that time was a crate with four gallons of milk. (R. at 43.) She spent very short periods of time at each position (around three months) because of her husband at the time was controlling and made her quit, and becauseshe was dealing with a child with Asperger's. (Id.)

### b.    Physical Health Issues

Plaintiff testified to her problems with sciatica, but informed the ALJ that this issue resolved in December of 2012. (R. at 47-47.) Plaintiff testified that the sciatica caused her to have difficulty standing for long periods of time and walking due to "shooting pains" in her leg and foot, which was only helped by adhering to her medication regimen. (R. at 44.) She described the pain as excruciating and indicated that it made sleep difficult. (R. at 45.) Plaintiff explained that she continued to have issues with her back, hip, and right knee, even after the sciatica problems ended. (R. at 47.) She had not seen a doctor for her right knee pain, but testified that her knee began to hurt after her sciatica subsided. (R. at 50.)

6

### c.      Mental Health Issues

Plaintiff also testified to mental health issues, including anxiety and depression, following her 2007 stroke.  (R. at 51.)  She noted that certain events, such as driving in the snow, trigger her anxiety.  (Id.)  Plaintiff described her bipolar disorder, noting that she has good days and bad days that involve crying spells and sadness in the depressive phase and feeling like she was on "cloud nine" in her manic phase.  (R. at 55-56.)  In addition, she testified to experiencing fatigue and three to eight headaches per month that decrease her focus.  (R. at 53-54.)  When she suffers from a headache, Plaintiff lies down in a dark environment and takes over the counter pain relievers.  (R. at 54.)

Plaintiff testified that her ability to work a full-time job would be limited by her low energy level, lack of focus, and inability to wake up on time.  (R. at 58-60.)  She further noted that she had previously skipped or doubled up on her medications.  (R. at 61.)  Plaintiff testified that she suffered from the side effects of her medication, including an inability to wake up with Seroquel and a bad reaction to Vicodin.  (R. at 62.)  Plaintiff indicated that she would be able to lift a gallon of milk if she did not have to carry it for "a while," could sit for about two hours, could stand for an hour, and could walk a mile with frequent breaks.  (R. at 63-65.)

Plaintiff testified that she cooked, shopped with her daughters, did dishes, did her own laundry, and shared the remainder of the chores with her daughters.

(R. at 66-67.)  She noted, however, that she takes breaks to sit down during long chores like cooking.  (R. at 68.)  Plaintiff testified that she used a computer every other day, spent time with her daughters, read, and watched television.  (R. at 69-70.)

### 2.    Vocational Expert Testimony

Mary Everts testified as the Vocational Expert ("VE") at the June 13, 2013 administrative hearing.  (R. at 77-88.)  The VE identified Plaintiff's past relevant work as: adult care provider, heavy as performed, semi-skilled with a specific vocational preparation ("SVP")[1] of 4; and cashier, medium as performed, unskilled, with an SVP of 2; and office helper, heavy as performed, unskilled, with an SVP of 2.  (R. at 78-79.)

The ALJ then presented a series of hypotheticals to the VE.  In the first one posed to the VE,, the ALJ asked if a hypothetical individual of Plaintiff's age, education, and work experience, could perform her past relevant work with the following limitations:

> [T]his individual is limited to light work.  They'd be able to lift up to 20 pounds occasionally, lift/carry up to 10 pounds frequently.  They'd be able to stand, walk for about six hours and sit for up to six hours in

---

[1] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P.

an eight hour work day with normal breaks.  They could perform occasional pushing and pulling. They could occasionally operate foot controls.  They can never climb ladders, ropes, or scaffolds.  They can occasionally climb ramps or stairs.  Occasionally balance, stoop, kneel, crouch, and crawl.  This individual would have to avoid all use of hazardous moving machinery.  They would have to avoid all exposure to unprotected heights.  Additionally, the work would be limited to simple, routine, repetitive tasks performed in a work environment free of fast paced production requirements involving only simple work related decisions and routine workplace changes.

(R. at 80.)  The VE testified that the hypothetical individual could perform as an office helper and cashier, as generally performed at the light level.  (R. at 81.)  In addition, the VE testified that the hypothetical individual could perform the following jobs:  inspector, with 5,700 jobs in the region and 129,000 nationally; and a reduced number of assembler positions, with 10,000 jobs in the region and 200,000 nationally.  (Id.)

In his second hypothetical, the ALJ asked the VE whether the first hypothetical individual could perform Plaintiff's past relevant work of office helper and cashier if he or she was allowed to sit or stand alternatively and was not off task for more than ten percent of the work period.  (R. at 81.)  He clarified that "at will" meant within five minutes of needing to sit or stand.  (R. at 82.)  The VE testified that the hypothetical individual could perform reduced numbers of Plaintiff's past work in the general office and cashier positions, along with reduced numbers of the assembler position (4,000 regionally, 90,000 nationally), reduced numbers of the inspector position (1,600 regionally, 34,000 nationally) and a light,

unskilled machine operator, with 3,000 jobs regionally and 90,000 nationally.  (R. at 83.)

In his third hypothetical, the VE asked whether the above hypothetical individual could perform Plaintiff's past relevant work of cashier or office helper if he or she were limited to sedentary work.  The VE testified that such a limitation would preclude Plaintiff's past work.  (R. at 83.)  According to the VE, however, the hypothetical individual could perform the following positions: information clerk, with 2,400 positions regionally and 85,000 nationally; inspector, with 500 positions regionally and 13,000 nationally; and packer, with 2,000 positions regionally and 70,000 nationally.  (R. at 84.)

The ALJ then asked the VE if the hypothetical individual in the third question would be precluded from work if he or she had a sit-stand option.  (R. at 84.)  The VE testified that the jobs provided in response to hypothetical number three would still apply.

Finally, the ALJ asked the VE if being off task for twenty percent of the day or missing more than two work days per month would be work preclusive, to which the VE testified in the affirmative.  (R. at 84-85.)  Nor would the hypothetical individual be able to lie down for as much as an hour (outside of his or her lunch break).  (R. at 85.)

## D.  THE ADMINISTRATIVE DECISION

On September 24, 2013, the ALJ issued his decision.  (R. at 10-23.)  At Step

1 of the sequential evaluation process,[2] the ALJ found that Plaintiff had not

engaged in substantially gainful activity since February 22, 2011.  (R. at 12.)

At Step 2, the ALJ found that Plaintiff had the following severe impairments:

degenerative disc disease of the lumbar spine, sciatica, status post cerebrovascular

accident (CVA) with residual headache and fatigue, arthritis, obesity, and

depression.  (R. at 12.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the  review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically,

Listings 1.02, 1.04, and 12.04.  (R. at 17.)

Between Steps 3 and 4 of the sequential process, the ALJ evaluated

Plaintiff's residual functional capacity ("RFC")[2] and determined that Plaintiff had

the capacity to perform sedentary work:

> [E]xcept allowing person to sit or stand alternatively, provided this
> person is not off task more than 10% of the work period.  Never climb
> ladders, ropes or scaffolds; can occasionally climb ramps or stairs,
> balance, stoop, kneel, crouch, and crawl.  Must avoid all hazardous
> moving machinery and exposure to unprotected heights.  Work is
> limited to simple, routine and repetitive tasks performed in a work
> environment free of fast-paced production requirements involving
> only simple work related decisions and routine workplace changes.

(R. at 19.)

Relying on the VE's testimony, the ALJ determined at Step 4 that Plaintiff

was unable to perform her past relevant work.  (R. at 22.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other

jobs that exist in significant numbers in the national economy.  (R. at 22-23.)  He

therefore concluded that Plaintiff was not disabled under the Social Security Act.

---

[2] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th
Cir. 2002).

## E.  STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from

[the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F. ANALYSIS

In her motion for summary judgment, Plaintiff asserts four statements of error. First, she contends that the ALJ's reliance upon the VE's responses to his hypothetical questions was not supported by substantial evidence. Second, she asserts that the ALJ erred in finding that her depression failed to meet or equal Listing 12.04. Third, she similarly argues that the ALJ erred with respect to Listing 1.04A. Finally, Plaintiff posits that the ALJ erred by improperly discounting her credibility. The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial

evidence supports the ALJ's conclusions.  I agree that the ALJ's conclusions are supported by substantial evidence and will address each argument in turn.

**1.      The ALJ's Reliance on VE Testimony is Supported by Substantial Evidence**

When, as here, an ALJ concludes that a claimant does not have the RFC to perform his or her past relevant work at Step 4, the burden shifts to the Commissioner at Step 5 to show that Plaintiff "possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This requires the Commissioner to "make a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal citations omitted). Such substantial evidence "may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Id.*

Here, Plaintiff takes issue with the ALJ's hypothetical questions, asserting that they did not accurately portray her physical and mental impairments. Specifically, she contends that the evidence does not support her capacity to lift twenty pounds occasionally and ten pounds frequently.  As evidence in her reply brief, she points to one lumbosacral MRI taken in the spring of 2012, which she

characterizes as "MRI findings of compression of the S1 nerve route . . . muscle spasms detected on clinical examination, dermatomal sensory diminution," and an ongoing conservative regimen of muscle relaxants, anti-inflammatories, narcotics, physical therapy, injections, rest, and exercise. (DE 13 at 24, R. at 425.) Plaintiff also asserts, generally, that the ALJ failed to account for the limitations related to her depression and headaches in his hypothetical questions to the VE.

As the Commissioner argues, however, Plaintiff does not meet her burden of establishing that her impairments caused more limitations than those assessed by the ALJ. *See* 20 C.F.R. § 416912(c) (Claimants bear the responsibility to provide evidence showing how their impairments affect their ability to work). The ALJ concluded that the RFC was supported by medical evidence, objective findings, and the opinions of medical providers. (R. at 22.) The RFC was reflected in his hypothetical questions to the VE.

Rather than identifying specific errors in the ALJ's RFC assessment (and corresponding hypotheticals), Plaintiff instead points to other evidence in the record that supports her conclusions and asks this Court to re-weigh the evidence in her favor. *See VanSingel v. Comm'r of Soc. Sec.*, 26 F. App'x 488, 489 (6th Cir. 2002) ("If supported by substantial evidence, the Commissioner's decision must be affirmed, even if [the reviewing court] would have arrived at a different result.") (citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir.1983)). The analysis

16

that Plaintiff urges would be incompatible with the 'substantial evidence' standard of review. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (concluding that "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."). Moreover, Plaintiff fails to demonstrate that the MRI results to which she points must provoke a finding that she was more functionally limited than the ALJ opined. *See Guy v. Comm'r of Soc. Sec.*, No. 11-12828, 2013 WL 1148413, at *5 (E.D. Mich. Feb. 19, 2013) *report and recommendation adopted*, No. 11-CV-12828, 2013 WL 1148412 (E.D. Mich. Mar. 19, 2013) (noting that "disability determinations turn on . . . the functional limitations caused by Plaintiff's impairment."). Accordingly, Plaintiff has failed to demonstrate that the ALJ's reliance on the VE's testimony in response to his hypotheticals was not supported by substantial evidence.

### 2. The ALJ's Analysis of Listing 12.04 is Supported by Substantial Evidence

Plaintiff bears the burden of proving that her impairments meet or medically equal a particular listing. *See Buress v. Sec'y of Health & Hum. Serv's*, 835 F.2d 139, 140 (6th Cir. 1987). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "A claimant must satisfy all of the criteria to meet the

17

listing." *Rabbers*, 582 F.3d at 653.  Moreover, all of the criteria must be met

concurrently for a period of twelve continuous months.  *See* 20 C.F.R.

§404.1525(c)(3), (4); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00D ("[b]ecause

abnormal physical findings may be intermittent, their presence over a period of

time must be established by a record of ongoing management and evaluation").

To qualify for a disability designation under Listing 12.04, a claimant must

show that he or she satisfies the criteria in Paragraphs A and B or C of the Listing.[3]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04.  Paragraph A requires clinical

findings which medically substantiate a mental disorder.  Paragraph B requires that

Plaintiff establish at least two of the following limitations:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence,
    or pace; or

    4. Repeated episodes of decompensation, each of extended
    duration[.]

*Id.*

Here, the ALJ concluded that Plaintiff had only mild restriction in activities

of daily living; mild difficulties in maintaining social functioning; moderate

difficulties with concentration, persistence, and pace ("CPP"); and no episodes of

---

[3] Plaintiff does not challenge the ALJ's conclusions with respect to Paragraph C.

18

decompensation.  (R. at 18-19.)  Plaintiff contends that the ALJ focused only on the Part B criteria and ignored the Part A criteria and that she meets the criteria of Parts B1, 2, and 3.

With respect to Plaintiff's activities of daily living, the ALJ assessed only a mild restriction, noting Plaintiff's ability to drive, perform light household chores, bath and dress herself, purchase groceries, and pay bills.  (R. at 18.)  Plaintiff argues that the ALJ's conclusion with respect to Plaintiff's self-reported activities of daily living is unfounded, but does not point to other evidence in the record to demonstrate that she is more restricted in this area.  As the Commissioner points out, however, other Courts have found that the type of activities Plaintiff engaged in are not indicative of a marked restriction in activities of daily living.  *See LeMaster v. Sec'y of Health & Hum. Servs.*, 802 F.2d 839, 841-42 (6th Cir. 1986) (analyzing the same element under Listing 12.06 and concluding that the claimant's ability to drive, visit friends and family, do occasional yard work, mow his lawn, and take care of his personal needs "belie[d] any notion" that he had a marked impairment); *Daniel v. Comm'r of Soc. Sec.*, No. 11-cv-13614, 2012 WL 4513644, at *9 (E.D. Mich. Sept. 30, 2012) *aff'd* 527 F. App'x 374 (6th Cir. 2013) (upholding the finding of a mild restriction where the claimant was "able to take personal care of herself, feed herself, drive, shop, spend entertainment time with friends, and manage money to a degree.").

Furthermore, such a conclusion is supported by the opinion of State Agency physician Thomas Tsai, M.D., to which the ALJ assigned great weight.  (R. at 95.) Plaintiff disputes the weight assigned to Dr. Tsai's opinion, noting that it was entitled to "zero weight" for the period after May 12, 2012 and to "very limited weight" before that date because Dr. Tsai did not examine Plaintiff.  However, nothing in the Regulations indicates that the ALJ was not entitled to rely on the opinion of a non-examining physician.  Instead, such individuals are considered "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," such that ALJ's "must consider" their findings as opinion evidence.  20 C.F.R. § 416.927(e)(2)(i).  Substantial evidence supports the ALJ's finding of a mild restriction in activities of daily living, with or without Dr. Tsai's opinion.

Plaintiff's argument with respect to her difficulties in maintaining social functioning is also unavailing.  The ALJ appropriately recognizes Plaintiff's crying spells, but also notes her self-reports that she gets along with her daughters, keeps in contact with friends and neighbors, and maintains close contact with her best friend.  (R. at 18 and 411.)  Such an analysis is sufficient to demonstrate that Plaintiff only has a mild restriction in this area, at best.  *See Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1993) (affirming the ALJ's conclusion that the claimant had only a mild restriction in maintaining social functioning where "[s]he attended

20

church and visited relatives" and her physician reported that she "related well to others.")  Additionally, the ALJ's conclusion is consistent with the opinion of Dr. Tsai and Plaintiff does not point to any additional evidence in the record to the contrary.

Finally, Plaintiff's challenge to the ALJ's conclusion that she had only moderate limitations with respect to CPP must also fail.  The ALJ considered Plaintiff's reports of side effects related to her medication and pain, but also cited her computer use and ability to follow television shows as evidence that she was only moderately restricted in this area.  Such a conclusion is again consistent with the opinion of Dr. Tsai.  (R. at 95.)  Plaintiff fails to point to any evidence that demonstrates that she is more severely limited in this area.  Accordingly, the ALJ's analysis of Plaintiff's impairments under Listing 12.04 is supported by substantial evidence and Plaintiff's argument is unavailing.

### 3.    The ALJ's Analysis of Listing 1.04 is Supported by Substantial Evidence

Plaintiff also challenges the ALJ's finding with respect to Listing 1.04A, which covers "[d]isorders of the spine . . . resulting in compromise of the nerve root . . . or the spinal cord" with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is

> involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04.  Here, the ALJ concluded that Plaintiff's condition was not characterized by nerve root compression with the necessary motor loss and sensory or reflex loss, nor was there evidence of positive straight-leg raise tests, both sitting and supine.  (R. at 17-18.)

Plaintiff asserts that evidence in the record shows that she was diagnosed with sciatica and lumbar radiculopathy, with a *borderline* positive straight leg raising test on the right.  (R. at 337, 339, 371, 375, 378, and 387.)  She points to evidence that she had muscle spasms and an antalgic gait.  (R. at 404.)  In addition, Plaintiff notes that a 2012 MRI showed the presence of disc protrusion and decreased sensation.  Although Plaintiff concedes that there is no evidence of muscle weakness, she argues that the evidence of her impaired gait is sufficient to meet the Listing.

Plaintiff fails to meet her burden to demonstrate that she has satisfied all criteria set forth in the Listing.  Although Plaintiff points to one MRI demonstrating right S1 radiculopathy from bulging disc and spondylitic changes (R. at 425), she does not point to any evidence of positive straight leg raise tests, both sitting and supine.  To the contrary, the record contains evidence of a negative straight leg raise test (R. at 339) and evidence of a single borderline positive straight leg raise test on the right only (R. at 337).  In addition, Plaintiff concedes

that there is no evidence of muscle weakness, but asks the Court to consider her impaired gait and muscle spasms as sufficient to meet the requirement.  Plaintiff does not point to any evidence, opinion, or case law demonstrating that such conditions are equivalent.  Nor does she develop an equivalence argument, other than to state that "there exists ample evidence for an equaling of Listed Impairment 1.04A, if not an actual meeting of the criteria for that Listed Impairment."  (DE 13 at 28.)   As the Commissioner notes, the record shows that Plaintiff had full muscle strength.  (R. at 337, 339, 416.)   Accordingly, the ALJ's conclusion that Plaintiff's impairments did not meet the criteria for Listing 1.04 was supported by substantial evidence.

### 4.     The ALJ's Credibility Analysis is Supported by Substantial Evidence

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.").  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 469, 475 (6th Cir. 2007).

Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."). When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 56.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p. A non-exhaustive list of relevant factors to be considered

24

by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .") (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, No. 13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  (R. at 21-22.)  Plaintiff asserts that the ALJ

25

failed to provide a logical basis for discounting her credibility.  Specifically, she

contends that the ALJ failed to incorporate her testimony regarding the regularity

of her headaches and their debilitating effects.  She takes issue with the ALJ's

reliance on her failure to quit smoking, despite instructions from her physicians to

do so.  Plaintiff also points to evidence in the record that her levels of pain "likely

would interfere with her ability to concentrate and remain focused on tasks" and

that her Global Assessment Functioning ("GAF") was assessed as 45-50.[4]  (DE 13

at 30.)  I conclude that the ALJ's credibility assessment was supported by

substantial evidence for several reasons.

   First, the ALJ did not err in considering evidence that Plaintiff continued to

smoke when evaluating her credibility.  The Sixth Circuit has generally held that

the ALJ may consider whether a claimant has followed a physician's advice to quit

smoking when evaluating the claimant's credibility.  In *Sias v. Secretary of Health*

---

[4] The GAF scale was used to report a clinician's judgment of an individual's
overall level of functioning.  Clinicians selected a specific GAF score within the
ten-point range by evaluating whether the individual was functioning at the higher
or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association,
4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 41-50 was indicative of
serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent
shoplifting) or any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34.  However,
"the most recent version of the DSM does not include a GAF rating for assessment
of mental disorders."  *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL
1328277, at *10 (E.D. Mich. Mar. 28, 2014).

*& Human Services*, 861 F. 2d 475, 480 (6th Cir. 1988), the Sixth Circuit found

substantial evidence to support the ALJ's disability determination where the

claimant's physicians had repeatedly warned him to quit smoking and he failed to

do so. The Sixth Circuit emphasized its point by stating:

> The Social Security Act did not repeal the principle of individual
> responsibility. Each of us faces myriads of choices in life, and the
> choices we make, whether we like it or not, have consequences. If the
> claimant in this case chooses to drive himself to an early grave, that is
> his privilege—but if he is not truly disabled, he has no right to require
> those who pay social security taxes to help underwrite the cost of his
> ride.

*Id.* at 480; *see also Brown v. Soc. Sec. Admin.*, 221 F.3d 1333 (6th Cir. 2000)

("Although Brown suffers from chronic obstructive pulmonary disease, his heavy

smoking habit indicates that the condition is not disabling."); *Starr v. Comm'r of*

*Soc. Sec.*, No. 08-12434, 2009 WL 2477548, at *10 (E.D. Mich. Aug. 10, 2009)

(concluding that it was appropriate for the ALJ to consider a claimant's smoking

"particularly where smoking reduces the effectiveness of treatment."). Here,

Plaintiff was repeatedly instructed that she should quit smoking. (*See, e.g.,* R. at

339, 364, 381, 389.) At one point, she was offered a free nicotrol inhaler in order

to help her quit, but indicated that she was not interested in smoking cessation. (R.

at 364.) The ALJ did not err by discounting Plaintiff's credibility based on her

failure to comply with multiple physicians' recommendations.

Second, the ALJ did not err in comparing Plaintiff's testimony to objective medical evidence in the record when assessing her credibility.  To support his conclusion that Plaintiff was less than credible, the ALJ pointed to a number of inconsistencies between Plaintiff's testimony and the medical evidence in the record.  For example, although Plaintiff testified to experiencing chronic problems with memory, concentration, and focus, clinical examinations revealed evidence to the contrary.  (R. at 412.)  Additionally, MRI evidence in the record demonstrates only mild findings in her lower back, full strength in her extremities, and Dr. Sabbagh's instruction to "be active and exercise," which conflicts with Plaintiff's testimony that her back pain is disabling.  (R. at 425.)  Accordingly, the ALJ did not err in assessing Plaintiff as less than credible where her subjective statements suggested a higher level of impairment than the evidence in the record.  *See Newsome v. Sullivan*, 897 F.2d 529, at *2 (6th Cir. 1990) (in weighing contradictory unsupported subjective statements of pain, the objective evidence is controlling).

Finally, Plaintiff points to no evidence in the record to demonstrate that her testimony regarding the debilitating effects of her headaches was credible.  She argues that the ALJ discounted her credibility "not on the basis of any medical documentation to the contrary," but also does not point the Court in the direction of any medical evidence *consistent* with her testimony.  While an ALJ may not

disregard the claimant's subjective statements "solely because they are not substantiated by objective medical evidence," a "strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p, 1996 WL 374186, at *1; *see also Saddler v. Comm'r of Soc. Sec.*, 173 F.3d 429 (6th Cir. 1999) (affirming a decision in which the ALJ found the claimant less than credible because her descriptions of the severity of her pain were inconsistent with the objective evidence in the record).  A review of the record does not demonstrate any such substantiation. Accordingly, Plaintiff fails to identify any errors with respect to the ALJ's credibility determination, which was supported by substantial evidence.

## G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Indeed, the ALJ's opinion appears to be thorough and well-supported.  Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 5, 2016

s/Anthony P. Patti
Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 5, 2016, electronically and/or by U.S. Mail.

s/Michael Williams

Case Manager for the
Honorable Anthony P. Patti